IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

JOHN H. TURNER,

      Plaintiff,

                                   6:14-CV-214-PK

                                   FINDINGS AND
v.                                RECOMMENDATION

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

      Defendant.

_____

PAPAK, Magistrate Judge:

      Plaintiff John H. Turner filed this action February 10, 2014, seeking judicial review of the

Commissioner of Social Security's final decision denying his applications for disability insurance

benefits ("DIB") under Title II of the Social Security Act (the "Act") and supplemental security

income disability insurance benefits ("SSI") under Title XVI of the Act. This court has

jurisdiction over plaintiff's action pursuant to 42 U.S.C. § 405(g) and 1383(c)(3).

      Turner argues that by erroneously rejecting the opinion of his treating nurse practitioner,

and erroneously rejecting his testimony regarding the degree of his symptoms and limitations, the

Commissioner failed properly to assess his residual functional capacity after completing step

three of the five-step sequential process for analyzing a Social Security claimant's entitlement to

Page 1 - FINDINGS AND RECOMMENDATION

benefits, and for that reason failed to carry her burden at step five of the process. I have

considered all of the parties' briefs and all of the evidence in the administrative record. For the

reasons set forth below, the Commissioner's final decision should be affirmed.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Act, a claimant must demonstrate an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected . . . to last for a continuous period of not

less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step

sequential process for determining whether a claimant has made the requisite demonstration. *See*

*Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. §§ 404.1520(a)(4),

416.920(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only

at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v.*

*Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if

any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If

the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be

found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i),

404.1520(b), 416.920(a)(4)(i), 416.920(b). Otherwise, the evaluation will proceed to the second

step.

At the second step, the ALJ considers the medical severity of the claimant's impairments.

*See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An

impairment is "severe" if it significantly limits the claimant's ability to perform basic work

Page 2 - FINDINGS AND RECOMMENDATION

activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c). Nevertheless, it is well established that "the step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996), *citing Bowen*, 482 U.S. at 153-154. "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual[']s ability to work." *Id.*, *quoting* S.S.R. 85-28, 1985 SSR LEXIS 19 (1985).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d). If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, between the third and the fourth steps the ALJ is required to assess the claimant's residual

functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related physical and/or mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof shifts, for the first time, to the Commissioner.

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether a person with those characteristics and RFC could perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. If the Commissioner meets her burden to demonstrate the existence in significant numbers in the national economy of

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." S.S.R. No. 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

Page 4 - FINDINGS AND RECOMMENDATION

jobs capable of being performed by a person with the RFC assessed by the ALJ between the third

and fourth steps of the five-step process, the claimant is found not to be disabled. *See Bowen*,

482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566,

416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. A claimant will be found entitled to benefits

if the Commissioner fails to meet that burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see*

*also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied

proper legal standards and his or her findings are supported by substantial evidence in the record.

*See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193

(9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a

preponderance; it is such relevant evidence as a reasonable person might accept as adequate to

support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing*

*Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports

and the evidence that detracts from the Commissioner's conclusion." *Id.*, *quoting Reddick v.*

*Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of

the Commissioner. *See id.*, *citing Robbins*, 466 F.3d at 882; *see also Edlund v. Massanari*, 253

F.3d 1152, 1156 (9th Cir. 2001). Moreover, the court may not rely upon its own independent

findings of fact in determining whether the ALJ's findings are supported by substantial evidence

of record. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003), *citing SEC v. Chenery*

*Corp.*, 332 U.S. 194, 196 (1947). If the ALJ's interpretation of the evidence is rational, it is

immaterial that the evidence may be "susceptible [of] more than one rational interpretation."

*Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d

1450, 1453 (9th Cir. 1984).

## SUMMARY OF ADMINISTRATIVE RECORD[2]

Turner was born on December 14, 1965. Tr. 155, 157, 174. He attended school through

the twelfth grade, and has received no subsequent specialized job or vocational training. Tr. 54,

187. According to the evidence of record, prior to his claimed disability onset date of December

26, 2010,[3] Turner worked as a forklift driver from October 1999 through August 2007; as a saw

operator, forklift operator, and grader from 2007 to 2009; and full-time as a laborer from June

2010 through December 26, 2010. Tr. 34, 69, 178, 187. Following his claimed disability onset

date, Turner has not worked.

In December 2005, Daniel Phillips, M..D., a gastroenterologist, diagnosed Turner with

Crohn's disease. Tr. 343. Turner had experienced abdominal discomfort, cramps, and diarrhea,

and lost 50 pounds. *Id*. After Turner developed a retroperitoneal abscess, Dr. Phillips conducted

surgery to remove part of his colon. *Id*.

Turner had follow-up appointments with Dr. Phillips on January 12, 2006 and July 7,

2006. Tr. 340, 341. At these appointments, Turner reported that he had not had any symptoms

related to his inflammatory bowel disease, except for a single isolated incident. *Id*. Dr. Phillips

noted that Turner had recovered 30 pounds of weight as of January, and an additional 33 pounds

---

[2] The following recitation constitutes a summary of the evidence contained within the Administrative Record, and does not reflect any independent finding of fact by the court.

[3] At the hearing before the ALJ, Turner amended his alleged onset date from May 1, 2010 to December 26, 2010. Tr. 41.

between January and July. *Id.* On June 20, 2007, Dr. Phillips noted that Turner had been "without symptoms" since surgery, and should return in two years for a follow up. Tr. 334.

Turner called Dr. Phillips' office on March 5, 2008, and spoke to Katera Hopkins, a registered nurse, stating he had been experiencing nausea for a month. Tr. 327. At that time, Turner reported that he hunted, fished, and ate his own fresh game. *Id.* Turner had used Prilosec without benefit, and asked about getting a prescription for medical marijuana or Marinol. *Id.* He was no longer taking Asacol or any other routine medications, and felt he was doing fine otherwise. *Id.* Dr. Phillips followed up the same day, recommending that Turner find and see a primary care physician, as the problem appeared to be new. *Id.* Turner apparently did not follow up on that recommendation.

On July 1, 2008, Turner saw Mary Fey, a family nurse practitioner, for pain in his lower back and left leg, with an onset date of three weeks earlier. Tr. 269. Turner stated that he had injured his back at work in the 1990s, but that the recent pain began when he was sitting in a chair. *Id.* Turner reported nausea, vomiting, and diarrhea secondary to Crohn's disease. Tr. 270. He had no weight loss, but some fatigue and trouble sleeping. *Id.* Turner had not missed work due to back pain, and at the time was working at a sawmill flipping boards. *Id.* Nurse practitioner ("NP") Fey noted that Turner had a decreased range of motion, change in gait, and pain down the back of his leg to the ankle. *Id.* She diagnosed lumbago and meralgia paresthetica, noting radiculopathy. *Id.* NP Fey prescribed Diclofenac, Fleril, and Skelaxin, and ordered x-rays. *Id.*

Turner returned to NP Fey on September 26, 2008 with lower back pain, stating that he was supposed to get x-rays seven weeks prior, but could not afford them. Tr. 271. NP Fey noted

Page 7 - FINDINGS AND RECOMMENDATION

that Turner's ability to bend forward was very limited because of pain, and he had decreased strength and sensation in his left foot. Tr. 272. NP Fey opined that Turner needed to get an x-ray and most likely an MRI. *Id.*

On November 12, 2008, Turner saw NP Fey again, complaining of left leg pain. Tr. 273. Turner had been "doing okay" with conservative treatment of his back pain until November 6, when he jumped off a catwalk at work, and felt a sudden sharp pain in his lower back and left leg. *Id.* Turner also had tingling and numbness in his left leg, but denied weakness. *Id.* He stated that he visited the emergency room the day before for unbearable pain, where he was given Vicodin and told to follow up with his primary care physician. *Id.* Turner experienced pain when lifting his fingertips above the knees, when standing up straight, and with lateral bend to the right. *Id.* NP Fey scheduled an MRI and warned Turner that using Vicodin could worsen his Crohn's disease. *Id.*

A November 14, 2008 MRI revealed multilevel degenerative disc disease with multiple endplate Schmorl's nodes throughout the lumbar spine; a broad-based concentric disc bulge at L4-L5 resulting in mild to moderate central stenosis; and a focal disc protrusion-extrusion at L5-S1 with profound encroachment and effacement of the descending traversing left S1 nerve root. Tr. 281.

NP Fey referred Turner to Dr. Robert Hacker, a neurosurgeon. Tr. 287. When he saw Dr. Hacker on November 20, 2008, Turner reported weakness and loss of sensation in his leg. *Id.* He complained of nausea, gas, and diarrhea, as well as back pain, stiffness, muscle weakness, loss of strength, and muscle aches. Tr. 288. Dr. Hacker noted that Turner walked with a limp favoring his left leg and his range of motion was limited in all planes. *Id.* Based on the MRI, Dr.

Page 8 - FINDINGS AND RECOMMENDATION

Hacker reported a sizable disc herniation with an extruded fragment at the left L5-S1 level. *Id*.
He diagnosed S1 radiculopathy with pronounced neurologic deficit due to disc herniation and
recommended a minimally invasive microdiscectomy. *Id*.

Dr. Hacker performed the microdiscectomy on December 8, 2008. Tr. 285. Turner had a
post-op follow-up on December 17, 2008 with Rebecca Babcock, a certified physician assistant.
Tr. 284. Turner reported improved strength in his left foot. *Id*. Babcock recorded hypesthesia to
the S1 distribution in the left, an absent achilles on the left, and a negative straight leg raise. *Id*.
She also noted that Turner's change of station was done slowly, and gait revealed a limp favoring
his left. *Id*. Babcock refilled Turner's Vicodin prescription. *Id*.

On January 27, 2009, Turner reported that his pain was better, but he still had numbness
and weakness in his left foot. Tr. 283. Dr. Hacker noted four out of five strength to the left foot
and hypesthesia at the left S1. *Id*. He released Turner to work activities and explained that
Turner "may always find a degree of numbness and weakness in the foot," but "ha[d] a chance of
finding progressive improvement as time goes by." *Id*.

Turner saw NP Fey on October 6, 2009, reporting that his lower back pain had been
"more unbearable" for a month and a half. Tr. 275. He stated that even after his surgery, the pain
was the same, and physical therapy did not help much. *Id*. Turner also mentioned he had been
"very busy" and "unable to . . . renew his Bridges to Access program." *Id*. NP Fey diagnosed
lumbago. Tr. 276.

On September 30, 2010, Turner saw NP Fey following treatment for a shin laceration at
Sacred Heart Medical Center. Tr. 301, 278. NP Fey recorded that Turner had a history of
Crohn's disease and chronic pain syndrome related to lumbar pain, with a failed lumbar

Page 9 - FINDINGS AND RECOMMENDATION

discectomy in 2008 and chronic left leg numbness. Tr. 278. Turner was using medical marijuana for his back pain and was not having active Crohn's flare-ups. *Id.*

On October 11, 2010, on the advice of a nurse in Dr. Phillips' office, Turner sought emergency care at Riverbend Hospital for abdominal pain and severe diarrhea. Tr. 295, 326. Prior to admission, Chandra Shekahar Ojha, M.D., examined Turner. Tr. 292-295. Turner reported that since his 2005 colectomy, he had experienced eight to ten loose and watery bowel movements daily and profound baseline nausea that was only responsive to medical marijuana. Tr. 292. Turner stated that the diarrhea and abdominal cramping had started three weeks prior, along with intermittent low grade fever, worsened nausea, weakness, and about a 20-pound weight loss. *Id.* Dr. Ojha admitted Turner to the hospital. Tr. 294.

A CT scan of Turner's abdomen on October 13, 2010 showed inflammatory stricture of the terminal ileum consistent with regional enteritis. Tr. 291, 298.

Turner's diagnoses upon his October 14, 2010 discharge were: Crohn's flare, abdominal pain, diarrhea, hypokalemia, dehydration, acute on chronic nausea, and chronic back pain. Tr. 291. He refused treatment with Asacol because of past adverse reactions, and could not afford Entocort as an outpatient because he did not have insurance. Tr. 292. Turner was given Vicodin and Prednisone, and was to continue his medical marijuana as directed. *Id.* He was instructed to follow up with Dr. Phillips for management of his Crohn's disease, and NP Fey for ongoing medical issues. *Id.*

Turner filed an application for disability insurance benefits and supplemental security income on January 25, 2011. Tr. 155-156; 157-163. In connection with his application, Turner claimed to be disabled by Crohn's disease, AC separation in the left shoulder, 2008 back surgery

Page 10 - FINDINGS AND RECOMMENDATION

for a blown disc, chronic back pain, and removal of 25 percent of the colon. Tr. 186. Turner reported that he stopped working on December 26, 2010 because he was laid off. *Id.*

Turner characterized his conditions as follows: "I spend half the time in the toilet and always feel nausios [sic]. With my back I can't sit stand walk or lay or bend very long without having serious back pain." Tr. 193. He described his pain as "burning," "aching," and occurring all day, every day. Tr. 217. Eating, bending, standing, walking, and lying down all caused and worsened the pain. *Id.*

Turner described the beginning of his day as follows: "After I wake up I spend the next two hours going back and forth to the toilet and trying to get my back loosened up. Then after nausea subsides get something to eat, get dressed and then start day." Tr. 194. His daily activities include taking his dog on short walks and preparing meals. Tr. 194-195. Turner's hobbies include fishing, which he does once a month for a few hours until his back hurts too much. Turner's social activities include walking and driving in the woods. Tr. 197. Turner can walk a half a mile before needing rest. Tr. 198. Turner's friend, Shannan Lilla, who lives with him, provided a report consistent with Turner's own self-report of his symptoms. Tr. 201-208. She stated that Turner fishes and goes to the woods one or two times a week. Tr. 205.

On March 24, 2011, Administration consulting physician Mary Ann Westfall, M. D., assessed Turner's physical residual functional capacity, opining that Turner's primary diagnosis was a spine disorder, and that his secondary diagnosis was Crohn's disease. Tr. 63-71, 72-80. Dr. Westfall opined that Turner could carry up to 20 pounds occasionally and 10 pounds frequently; could stand, walk, or sit with normal breaks about six hours in an eight-hour workday; was unlimited in pushing and pulling other than lifting and carrying; could frequently

Page 11 - FINDINGS AND RECOMMENDATION

climb a ramp or stairs, balance, kneel, or crouch; and could occasionally climb ladders or scaffolds, bend, or crawl. Tr. 67-68. Dr. Westfall opined that Turner had no manipulative, visual, or communicative limitations, but should avoid concentrated exposure to hazards, such as machinery or heights, and have easy access to bathroom facilities. Tr. 68, 69. Dr. Westfall noted that Turner's allegations were "partially credible." Tr. 75.

Based on Dr. Westfall's assessment of Turner's physical RFC, on March 28, 2011, the Administration determined that Turner was capable of light work, including jobs such as flagger, wire worker, or cannery worker. Tr. 70, 79.

The Administration found Turner not disabled by his disorder of the back (discogenic and degenerative) and inflammatory bowel disease. TR. 81, 82. The Administration advised Turner of its decision that he was not disabled for purposes of the Act on March 30, 2011. Tr. 103-106, 107-110.

On April 14, 2011, following a visit to the emergency room, Turner saw NP Fey for pain in his lower back, radiating down the back of his leg. Tr. 321-322. Turner stated that he did not have insurance and did not want to go to physical therapy due to the cost, but was willing to use exercises at home. *Id.* NP Fey noted localized tenderness in the paravertebral muscles, pain all over the vertebral body, decreased strength in the left lower leg against resistance, and decreased dorsi and plantarflexion. *Id.* NP Fey assessed L5-S1 disc pain with radicular symptoms. *Id.* NP Fey refilled Turner's Percocet, Ibuprofen, and Flexeril, and told him to use heat or ice on his back, rest, and elevate his leg. *Id.* Turner had a follow-up appointment scheduled for May 13, 2011 with Dr. Hauck. *Id.*

On April 18, 2011, Turner reported no change in illness or injuries and no new physical

Page 12 - FINDINGS AND RECOMMENDATION

or mental limitations since January 25, 2011. Tr. 218-222. On May 2, 2011, on reconsideration

of Turner's medical records, Administration consulting physician Linda L. Jensen, M.D., opined

that Dr. Westfall's March 2011 assessment of Turner's physical RFC should be "affirmed as

written." Tr. 86, 95. In consequence, on the same day, the Administration determined on

reconsideration that Turner was not disabled by his disorders of the back and inflammatory

bowel disease. Tr. 101, 102. The Administration notified Turner of its decision on

reconsideration on May 3, 2011. Tr. 114-116, 117-118, 119.

On May 6, 2011, Turner requested a hearing before an Administrative Law Judge. Tr.

120-121. In connection with that request, Turner reported no changes in his conditions since

April 18, 2011. Tr. 227-231.

On May 13, 2011, Turner saw Erik F. Hauck, M.D., for leg numbness, weakness, and

back pain. Tr. 311. Turner reported recurrent symptoms, the same as prior to his back surgery:

inability to walk on his tip toes, inability to feel the back of his left leg, and excruciating pain.

*Id.* Dr. Hauck reported that Turner was in significant distress, had diminished sensorium in his

left S1 nerve root dermatome, and had weakness in his gastrocnemius muscle on the left side. *Id.*

He also noted that Turner was positive for stomach pains and altered bowel habits. *Id.* Dr.

Hauck found that Turner otherwise had good strength and normal sensorium, and specifically

recorded: "[Turner] has a skin tan as he is doing a lot of outdoor activities such as fishing. Just

yesterday, the patient was able to catch a 30 inch long steelehead [sic]." *Id.* Dr. Hauck assessed

that Turner had a symptomatic herniated disc and recommended a microdiscectomy. Tr. 312.

Turner underwent surgery on May 17, 2011. Tr. 313. Upon discharge the next day,

Turner was able to ambulate without cramping pains down his left leg. Tr. 310. He still had

Page 13 - FINDINGS AND RECOMMENDATION

numbness in his left leg, but it was improved in his foot. *Id.* Turner had a follow-up appointment scheduled for June 9, 2011. *Id.*

On January 19, 2012, Turner saw NP Fey for increased back pain. Tr. 318-320. Turner stated that Dr. Hauck had told him that "he may indeed have more scar tissue form and may have to do something more." Tr. 319. NP Fey opined that, "[Turner's] biggest problem is that he also has Crohn's disease and is not tolerant of anti-inflammatories, so he has to use narcotics, which he does not tolerate well . . . ." *Id.* NP Fey conducted a "very limited exam," noting that Turner had decreased straight leg lift from a sitting position and pain from minimal motion. *Id.* She diagnosed Turner with ongoing lumbago, and gave him Vicodin, but recommended that he not take it every day. *Id.* NP Fey recorded: "[Turner] will . . . notify me when he does indeed get his disability approved. He will most likely need further testing and/or surgeries at some point." *Id.*

A semi-legible January 24, 2012 medical record from South Lane Medical Group describes Turner's conditions as: "failed back surgery (twice)" and "inability to treat pain" due to Crohn's. Tr. 316.

On March 7, 2012, Turner reported that NP Fey had provided him with medical treatment since the last time he submitted medical records in support of his application. Tr. 242. He reported using hydroco/apap three times a day for pain, cyclobenzapr three times a day as a muscle relaxer, and medical marijuana one to three times daily for Crohn's and pain. Tr. 243.

On May 7, 2012, Oregon Health Authority's Medical Marijuana Program ("OHA OMMP") issued Turner a patient identification card. Tr. 246.

On July 9, 2012, NP Fey wrote a letter stating that Turner's lower back pain and Crohn's disease interfere with his work so that he is not able to work full-time. Tr. 245. According to NP

Page 14 - FINDINGS AND RECOMMENDATION

Fey, Turner, due to his Crohn's disease, cannot take anti-inflammatories for his back pain; has diarrhea between five and twenty times a day; has abdominal pains almost daily, exacerbated by bending, twisting, and lifting; and is forced to use muscle relaxers to treat his pain, which makes him sleepy. *Id.* She stated that Turner "is not able to do many jobs and is not able to get far from a bathroom." *Id.*

Six of Turner's friends each submitted letters: one on July 17, 2012, one on July 23, 2012, and four on September 5, 2012. Tr. 247, 248, 249, 250, 251, 252-253. The letters describe Turner as: barely able to move and in complete misery due to his back pain and Crohn's, Tr. 247, 251, 259; "unable to take out the trash, let alone go to work," Tr. 251; "woozy" from his medications and incapable of operating machinery, Tr. 248; and using the toilet 90 percent of the day, Tr. 252.

On September 11, 2012, a hearing was conducted before an ALJ in connection with Turner's DIB and SSI applications. Tr. 35-62. Appearing at the hearing were Turner, his counsel, and a vocational expert. *Id.*

At the hearing, Turner testified in relevant part that he was laid off on December 26, 2010 after spending a week in the hospital. Tr. 40, 42, 46, 52. Turner explained that his bosses had known him since before he was diagnosed with Crohn's, and indicated that they were accommodating while he was employed. Tr. 46, 50. Turner stated that his condition has worsened since December 2010. Tr. 44. Specifically, Turner uses the bathroom five to twenty times a day, Tr. 45; spends three or four hours total per day in the bathroom, Tr. 46; can lift about five to ten pounds, Tr. 46; can stand or sit for about twenty minutes at a time, Tr. 46-47; needs to lie down three to four hours per day, but can only do so for an hour at a time, Tr. 47; and can

Page 15 - FINDINGS AND RECOMMENDATION

drive short distances, Tr. 48. Turner stated that he has no feeling in his left leg or foot, Tr. 43, and his back hurts constantly, with a typical pain level of seven out of ten, Tr. 49. Turner's prescription narcotics make him nauseous, but he cannot take anti-inflammatories or antibiotics due to his Crohn's. Tr. 42, 44-45. After his second surgery, Turner's leg and foot were still numb, and the pain in his leg and back stopped for two and a half weeks before returning. Tr. 48. Turner further testified that his girlfriend helps him with cooking, cleaning, and daily chores. Tr.43. Turner also stated that he has not had insurance since 2010, but had his bills paid using the "Bridges program." *Id.*

Also at the hearing, a vocational expert provided testimony that an individual of the same age, educational background, and work experience as Turner, who is able to lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently; can stand or walk four out of eight hours; can occasionally climb, kneel, stoop, crawl, or crouch; can never climb ladders, ropes, or scaffolds; should not be exposed to hazards such as unprotected heights or moving machinery; can only occasionally operate foot controls with the left lower extremity; should perform work indoors with proximity to a bathroom; must perform work that can be safely discontinued on an unscheduled basis to use the bathroom; and needs to change position between sitting and standing as necessary, would be capable of performing work that exists in the national or local economy, such as assembler, electronics worker, or folder. Tr. 54-56.

However, if the individual needed to lie down outside of prescribed break periods, he would not be able to perform those jobs or any other work in the competitive labor market. Tr. 56-57. If the individual needed to use the bathroom four or five times every work shift for ten minutes, he would not be employable in the competitive market. Tr. 57-58. If the individual

Page 16 - FINDINGS AND RECOMMENDATION

were either in the bathroom or lying down half the workday, or missed work on an ongoing and consistent basis more than two days per month, that would preclude competitive employment. Tr. 58. An employee could be off task less than five percent of the day, or about 40 to 50 minutes, in order to remain employable in the competitive labor market. *Id.*

On November 28, 2012, the ALJ denied Turner's application for disability insurance benefits and supplemental security income disability insurance benefits. Tr. 10-12, 13-22. Turner timely requested review of the ALJ's decision, Tr. 7-8, and the Appeals Council denied his request on December 13, 2013. Tr. 1-4. In consequence, the ALJ's decision of November 28, 2012, became the Administrator's final order for purposes of judicial review. *See* 20 C.F.R. § 422.210(a); *see also*, e.g., *Sims v. Apfel*, 530 U.S. 103, 107 (2000). This action followed.

## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the Administrative Law Judge found that Turner did not engage in substantial gainful activity at any time following his amended disability onset date of December 26, 2010. Tr. 15. He therefore proceeded to the second step of the analysis.

At the second step, the ALJ found that Turner's medical impairments of "S1-L5 degenerative disk disease with radiculopathy and Crohn's disease" were "severe" for the purposes of the Act. Tr. 15. Because the impairments caused by degenerative disc disease and Crohn's disease were deemed severe, the ALJ properly proceeded to the third step of the analysis.

At the third step, the ALJ found that none of Turner's impairments was the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. Tr. 16. The ALJ therefore properly conducted an assessment of Turner's residual functional capacity.

Page 17 - FINDINGS AND RECOMMENDATION

Specifically, the ALJ found that at all material time Turner had the residual functional capacity to

perform work:

> at a reduced range of light exertional work, as defined in 20 C.F.R. 404.11567(b) and
> 416.967(b), except for the following. He is able to lift, carry, push and pull 20 pounds
> occasionally, and 10 pounds frequently, stand and/or walk 4/8 hours, needs to be able to
> change position between sitting and standing as needed, sit at least 6/8 hours, able to
> occasionally climb, never climb ladders, ropes, or scaffolds, frequently balance,
> occasionally stoop, occasionally kneel, occasionally crouch, occasionally crawl, able to
> operate foot controls only occasionally with left lower extremity, should avoid exposure
> to hazards such as unprotected heights and moving machinery, needs to work indoors,
> with access to a bathroom, and be able to safely discontinued work on an unscheduled
> basis to use the bathroom.

Tr. 16. In reaching this finding, the ALJ considered all symptoms and the extent to which the

symptoms could reasonably be accepted as consistent with the objective medical evidence and

other evidence, as well as opinion evidence. Tr. 16-17.

At the fourth step of the five-step process, the ALJ found that Turner was unable to

perform his past relevant work. Tr. 20.

At the fifth step, the ALJ found, in light of Turner's age, education, work experience, and

RFC, that there were jobs existing in significant numbers in the economy that he could perform.

Tr. 21. Relying in part on the testimony of an objective vocational expert, the ALJ cited as

examples of unskilled light exertional work that Turner could perform, notwithstanding the

limitations listed in his RFC: counter person, ironer, and host/greeter. *Id.* Based on the finding

that Turner could perform the duties of jobs existing in significant numbers in the economy, the

ALJ concluded that he was not disabled as defined in the Act at any time between December 26,

2010, and November 28, 2012. Tr. 21-22.

## ANALYSIS

Turner challenges the Commissioner's assessment of his residual functional capacity. Specifically, Turner argues that the Administrative Law Judge improperly rejected the July 2012 opinion of treating nurse practitioner Fey and improperly failed to credit Turner's own testimony regarding the severity of his symptoms and limitations. Turner further argues that, in light of the alleged errors in the ALJ's assessment of Turner's RFC, the Commissioner failed to carry her burden at the fifth step of the five-step process. I address each of Turner's arguments in turn.

## I. Residual Functional Capacity

### A. Medical Opinion of Treating Nurse Practitioner Mary Fey

As noted above, NP Fey wrote a letter on July 9, 2012, stating that Turner's lower back pain and Crohn's disease interfere with his work so that he is unable to work full-time. Tr. 245. According to NP Fey's letter, Turner, due to his Crohn's disease, cannot take anti-inflammatories for his back pain; has diarrhea between five and twenty times a day; has abdominal pains almost daily, exacerbated by bending, twisting, and lifting; and is forced to use muscle relaxers to treat his pain, which makes him sleepy. *Id.* She stated that Turner "is not able to do many jobs and is not able to get far from a bathroom." *Id.* Before the letter, the last times Turner saw NP Fey were January 19, 2012, when she conducted a "limited exam," Tr. 318-320, and April 14, 2011, Tr. 321-323.

Turner argues that the Administrative Law Judge improperly rejected NP Fey's opinion. Turner asserts that NP Fey was aware that his access to medical treatment was limited because of lack of insurance, and "[his] allegations are highly consistent with two failed back surgeries and CT evidence of Crohn's disease, so it was not unreasonable for Fey to rely on that evidence." Pl.

Page 19 - FINDINGS AND RECOMMENDATION

Br. #14, 17.

The regulations define nurse practitioners as "other sources," and exclude them from the

list of health care providers who are "acceptable medical sources." 20 C.F.R. § 404.1513(a), (d).

Nurse practitioners may provide insight into the severity of impairments and how they affect an

individual's ability to function, but only acceptable medical sources can provide medical

opinions. 20 C.F.R. § 404.1513(d); 20 C.F.R. § 404.1527(a)(2). The opinions of other sources

are evaluated as the statements of lay witnesses. *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217,

1223-24 (9th Cir.2010). An ALJ may properly disregard lay testimony if he "'gives reasons

germane to each witness for doing so.'" *Id.* at 1224.

Here, the ALJ offered several reasons for disregarding NP Fey's opinion:

Ms. Fey made no effort to assess credibility, consider inconsistencies between subjective
reports and objective findings or seek a physical functional capacity to work. She also
apparently overlooked the claimant's increasingly infrequent visits. Instead, seems [sic]
to have uncritically accepted as true the claimant's allegations without support of any
objective medical evidence or physical capacity evaluation.

Tr. 19. The ALJ was not obligated to consider NP Fey's conclusory statements regarding

Turner's inability to work. Additionally, the ALJ correctly noted that NP Fey's letter offered no

supporting objective medical evidence, and merely presented Turner's own subjective symptom

statements as her own findings. Accordingly, because the ALJ provided several specific and

legitimate reasons for discrediting NP Fey's July 2012 opinion, the ALJ's credibility decision

provides no grounds for disturbing the Commissioner's final decision.

## B. Turner's Lay Opinion Testimony

As noted above, in connection with his DIB and SSI application, Turner characterized the

impairments caused by his back and Crohn's disease as follows: "I spend half the time in the

Page 20 - FINDINGS AND RECOMMENDATION

toilet and always feel nausios [sic]. With my back I can't sit stand walk or lay or bend very long

without having serious back pain." Tr. 193. He described his pain as "burning," "aching," and

occurring all day, every day. Tr. 217. Eating, bending, standing, walking, and laying all caused

and worsened the pain. *Id.* At the hearing, Turner testified that his condition has worsened since

December 2010. Tr. 44. Specifically, Turner uses the bathroom five to twenty times a day, Tr.

45; spends three or four hours total per day in the bathroom, Tr. 46; can lift about five to ten

pounds, Tr. 46; can stand or sit for about twenty minutes at a time, Tr. 46-47; needs to lie down

three to four hours per day, but can only do so for an hour at a time, Tr. 47; and can drive short

distances, Tr. 48. Turner stated that he has no feeling in his left leg or foot, Tr. 43, and his back

hurts constantly, with a typical pain level of seven out of ten, Tr. 49. Turner's prescription

narcotics make him nauseous. Tr. 45. After his second surgery, Turner's leg and foot were still

numb, and the pain in his leg and back stopped for two and a half weeks before returning. Tr. 48.

Turner further testified that his girlfriend helps him with cooking, cleaning, and daily chores.

Tr.43. Turner argues that the Administrative Law Judge improperly failed to credit his

statements concerning the intensity, persistence, and limiting effects of his symptoms.

When a claimant has medically documented impairments that could reasonably be

expected to produce some degree of symptoms, and the record contains no affirmative evidence

of malingering, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms

only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d

1273, 1281 (9th Cir.1996) (internal citation omitted). A general assertion that the claimant is not

credible is insufficient; the ALJ must "state which . . . testimony is not credible and what

evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th

Page 21 - FINDINGS AND RECOMMENDATION

Cir.1993). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir.1995) (internal citation omitted). If the "ALJ's credibility finding is supported by substantial evidence in the record, [the court] may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir.2002) (internal citation omitted).

In weighing a claimant's credibility, the ALJ may consider, *inter alia*, the "claimant's reputation for truthfulness, inconsistences either in claimant's testimony or between h[is] testimony and h[is] conduct, claimant's daily activities, h[is] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complains." *Id.* (internal modifications omitted), *citing Light v. SSA*, 119 F.3d789, 792 (9th Cir. 1997). Even where a claimant has offered equivocal testimony regarding his ability to perform his daily activities, the ALJ can still reasonably discredit the claimant's testimony. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001).

The ALJ provided clear and convincing reasons for discrediting Turner's testimony. First, the ALJ found that the objective medical evidence did not support Turner's alleged degree of symptoms and limitations from Crohn's disease since his amended onset date. Tr. 17. In December 2005, Turner had a successful colectomy stabilizing his Crohn's. Tr. 343-345. Between March 2008 and October 2010, Turner sought treatment for his back, but not for his Crohn's. Tr. 269-279, 271-272, 273-274, 287-289, 285-286, 283, 275-276, 277-279. Though Turner experienced a Crohn's flare in October 2010, the ALJ correctly noted that there were few, if any, objective medical findings of or attempts to seek treatment for Crohn's disease after October 2010, and therefore after Turner's December 2010 alleged onset date. Tr. 18. Turner

Page 22 - FINDINGS AND RECOMMENDATION

argues that an ALJ "should not discredit a claimant for not obtaining treatment he cannot afford." Pl. Br. #14, 14. Though Turner has not had insurance since 2010, he continued to seek treatment for his back, and testified that he "got [his] bills paid by using [the] Bridges program." Tr. 43, 321-323, 310-314, 317-320. Turner has not stated that he cannot afford to seek any treatment for his Crohn's. The record indicates that Turner has periodically declined specific treatments, such as certain medications, physical therapy for his back, and x-rays, but not that he generally cannot afford treatment for his back condition and Crohn's. Tr. 292, 271, 322. The ALJ did not err in finding that the objective medical evidence is inconsistent with the extreme gastrointestinal symptoms Turner alleges.

Second, the ALJ found that the medical evidence did not establish twelve consecutive months of disabling symptoms connected to Turner's back condition. After Turner's December 2010 onset date, Dr. Hauck performed a redo left L5-S1 microdiscectomy on May 17, 2011. Tr. 310. The next day, Turner could ambulate independently and no longer had cramping pain in his left leg, though he was still experiencing some numbness. *Id.* There is no evidence that Turner returned for a follow up in June 2011 as directed by Dr. Hauck. Tr. 310. Turner next sought treatment for his back on January 19, 2012, when NP Fey conducted a limited exam, finding decreased straight leg lift from a sitting position, and pain with minimal motion. Tr. 319. NP Fey diagnosed ongoing lumbago, prescribed Vicodin, and recommended that Turner try acetaminophen or Advil. *Id.* She noted that Turner would likely need further testing and surgeries. *Id.* In a partially legible January 2012 record from South Lane Medical Group, Turner was diagnosed with "failed back surgery (twice)" and "inability to treat pain" due to Crohn's. Tr. 316. On July 9, 2012, NP Fey wrote a letter restating Turner's reported Crohn's symptoms and

Page 23 - FINDINGS AND RECOMMENDATION

opining that he could not work. Tr. 245. The ALJ correctly found that in light of Turner's

temporary recovery after his second surgery, and subsequent intermittent treatment for back pain,

the medical evidence did not establish twelve consecutive months of disabling symptoms after

the December 2010 onset date.

Third, the ALJ found that Turner's daily activities conflicted with his alleged extreme

physical limitations and pain. The ALJ noted that:

> [Turner] independently performs all personal care, cleans and washes laundry weekly for
> two hours, prepares meals daily for about one hour, shops once a week for two hours, He
> [sic] drives to the woods weekly. The degree of pain alleged by the claimant has not
> prevented him from walking, driving a car, and shopping, as stated. Furthermore, he
> handles all finances independently without reminders, pays attention for up to two hours
> and finishes what he starts. He follows written-spoken instructions, handles stress and
> routine changes well. He goes outside several times daily and mows. He hunts and
> fishes once a month and eats his own fresh natural game (citation omitted).

Tr. 19. Turner qualified these abilities in his February 16, 2011 Function Report, stating that all

his activities cause him pain after a short time. Tr. 198. The ALJ nonetheless found that these

activities were "more than would be expected from an individual who can do no work at all." Tr.

19. While Turner's statements regarding his activities and symptoms may be subject to an

alternative explanation which would not undermine his credibility, this court is not authorized to

reject the ALJ's finding simply because it is premised on evidence subject to more than one

reasonable interpretation. *See Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995). Turner's

reported activities provided substantial evidence conflicting with his severe symptoms, such as

his need to use the bathroom an average of ten times a day and lie down three to four hours a day.

Tr. 45, 47. The ALJ reasonably found that Turner's reported activities were at odds with his

alleged severe physical limitations and pain.

Fourth, the ALJ found inconsistencies in Turner's statements. In February 2011, Turner reported that his medications did not cause side effects. Tr. 199. In testimony, however, Turner alleged his prescription narcotics make him nauseous. Tr. 45. Additionally, Turner testified that he spent a total of three to four hours in the bathroom daily, Tr. 45-46, though in May 2011, on admission for his second back surgery, Turner had tan skin and was "doing a lot of outdoor activities such as fishing," Tr. 311. The ALJ's reasoning regarding Turner's inconsistent statements is not convincing. Rather than evaluating Turner's statements as a whole, the ALJ isolated individual statements made over a year apart in order to identify inconsistencies. The pairs of statements are consistent with Turner's testimony that his condition has been worsening since December 2010. Tr. 44. The ALJ did not provide substantial evidence to support these inconsistencies or their significance.

Finally, although Turner testified that his December 2010 lay-off was connected to a stint in the hospital for his back, Tr. 46, 52, there is no medical evidence that Turner sought treatment for his back between October 2009 and April 2011. Tr. 275-276, 321-323. The ALJ correctly noted that there was no medical event associated with Turner's alleged onset date.

In light of the other reasons the ALJ provided for Turner's lack of credibility, the ALJ's error in identifying inconsistencies in Turner's statements was harmless. *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1162-63 (9th Cir. 2008). The ALJ offered clear and convincing reasons supported by substantial evidence in the record that are sufficient to permit the conclusion that the ALJ did not arbitrarily reject Turner's testimony. Because the ALJ's credibility determination is supported by substantial evidence in the record and was made pursuant to proper legal standards, his credibility findings provide no grounds for disturbing the

Page 25 - FINDINGS AND RECOMMENDATION

Commissioner's final decision.

**II.     Step Five: Existence of Jobs the Claimant Could Perform in the National Economy**

As discussed above, Turner argues that the Administrative Law Judge erred in his assessment of Turner's residual functional capacity. On that basis, Turner argues that the Commissioner failed to meet her burden at the fifth step of the five-step process to demonstrate that, in light of his residual functional capacity, Turner was capable of performing jobs existing in significant numbers in the economy. Turner asserts that the hypothetical question to the vocational expert (VE) was incomplete because it did not accurately reflect all of his functional limitations. Specifically, Turner argues that the ALJ improperly omitted from the RFC the functional limitations testified to by Turner and opined by NP Fey. However, as discussed above, the ALJ did not err in his assessment of Turner's RFC. In consequence, the ALJ's hypothetical to the VE included only those restrictions on Turner's abilities that were supported by substantial evidence in the record. *See Magallanes v. Bowen*, 881 F.2d 747, 756-757 (9th Cir. 1989). It follows that the Commissioner met her burden at the fifth step of the five-step sequential process.

## CONCLUSION

For the reasons set forth above, the Commissioner's final decision denying Turner's application for disability benefits should be affirmed.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If

objections are filed, then a response is due fourteen (14) days after being served with a copy of

the objections. When the response is due or filed, whichever date is earlier, the Findings and

Recommendation will go under advisement.

Dated this 9th day of July, 2015.

Honorable Paul Papak
United States Magistrate Judge